## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| BRIAN BRADEL, Derivatively on Behalf of ADT Inc., | |
| Plaintiff, | Case No. |
| v. | |
| TIMOTHY J. WHALL, JAMES D. DEVRIES, JEFFREY LIKOSAR, P. GRAY FINNEY, MARC E. BECKER, REED B. RAYMAN, MATTHEW H. NORD, ANDREW D. AFRICK, ERIC L. PRESS, LEE J. SOLOMON, STEPHANIE DRESCHER, BRETT WATSON, DAVID RYAN, APOLLO GLOBAL MANAGEMENT, LLC, PRIME SECURITY SERVICES TOPCO PARENT, L.P., APOLLO MANAGEMENT HOLDINGS, L.P., APOLLO MANAGEMENT HOLDINGS, GP, LLC, APOLLO MANAGEMENT, L.P., and APOLLO MANAGEMENT GP, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ADT INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Brian Bradel ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant ADT Incorporated ("ADT" or the "Company"), files this Verified Shareholder Derivative Complaint against Timothy J. Whall, James D. Devries, Jeffrey Likosar, P. Gray Finney, Marc E. Becker, Reed B. Rayman, Matthew H. Nord, Andrew D. Africk, Eric L. Press, Lee J. Solomon, Stephanie Drescher, Brett Watson, and David Ryan (collectively, the

"Individual Defendants") and Apollo Global Management, LLC ("Apollo"), Prime Security Services TopCo Parent, L.P., Apollo Management Holdings, L.P., Apollo Management Holdings, GP, LLC, Apollo Management, L.P., and Apollo Management GP, LLC (collectively with Apollo, the "Apollo Defendants," and together with the Individual Defendants and ADT, the "Defendants"), for breaches of their fiduciary duties, unjust enrichment, and violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act") and violations of Section 20(a) of the Exchange Act.  Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by his attorneys.  This investigation included, among other things, a review of the Company's announcements and press releases, filings made by the Company with the United States Securities and Exchange Commission ("SEC"), corporate governance documents available on the Company's website, securities analysts' reports about ADT, and news reports and other publicly available information about the Company.

## NATURE OF THE ACTION

1.       This shareholder derivative action arises from the defendants' breaches of fiduciary duties owed to the Company and violations of federal securities laws beginning in January 2018 and continuing through the present (the "Relevant Period").

2.       ADT has provided home-security-monitoring and automation services for over 100 years.  The Company was taken public for the first time in October 2012, but was taken private in May 2016 by Apollo, which then took ADT public again just nineteen months later.

3.       The fundamental nature of ADT's business has changed over the past decade and while the Company has made an effort to keep pace with the rapidly evolving market in which it operates, its competitors continue to nip at ADT's heels.

4.      In 2010, ADT introduced the ADT Pulse which allows users to access various features of their home security systems on the mobile devices.

5.      In 2016, ADT began a collaboration with the company Zonoff.  The two companies combined their areas of expertise – ADT's proprietary information regarding professional security monitoring and Zonoff's technological prowess – to create the Z1 Platform ("Z1").  Z1 was poised to provide ADT with a much-needed competitive edge as it would serve as the backbone for a more flexible, self-installed security system.

6.      However, even with the ink still wet on the services agreement with ADT, Zonoff began to experience serious financial difficulties and reached out to the Company for multiple bailouts.  Zonoff entered talks with Honeywell to arrange a potential acquisition and cure its financial woes, but when Honeywell walked away from the deal, Zonoff abruptly shut its doors.

7.      By January 2017, ADT's investment in Zonoff exceeded $36 million.  After Zonoff suspended its business, ADT learned that an up and coming competitor, Ring, had hired members of Zonoff's upper management and gained access to Z1, which it was already planning to use in its new product development.

8.      ADT filed suit to enjoin Ring from using Z1 in its new products.  The litigation ultimately ended in a $25 million settlement payment to ADT ($11 million less than the total amount ADT invested in its collaboration with Zonoff) in exchange for relinquishing its rights to Z1.  Ring immediately capitalized on its Z1 ownership and released Ring Protect in July 2018.

9.      On September 28, 2017, while the litigation against Zonoff was still pending, ADT filed a draft registration statement with the Securities and Exchange Commission ("SEC") on Form S-1 to pursue an initial public offering.  After several comments from the SEC and subsequent

amendments, the Form S-1 was declared effective on January 18, 2018 and used to conduct an initial public offering of ADT shares (the "IPO").

10.     On January 19, 2018, the Company priced the IPO at $14 per share.  A final prospectus was filed on January 22, 2018 (the "Prospectus").  The Prospectus, the Form S-1 and all amendments made thereto, are collectively referred to herein as the "Registration Statement."

11.     The Registration Statement made a number of material misstatements or omissions of fact necessary to prevent other statements from being misleading.  Notably, the Company did not disclose the existence of, or details about, the litigation pending against Zonoff.  The Registration Statement did not mention the potential financial or operational effects of a settlement agreement, nor did it discuss the specific competitive disadvantage to ADT caused by Ring's acquisition of the Z1 Platform.

12.     The Registration Statement also failed to disclose the rapidly evolving and increasingly competitive nature of ADT's market.  The Company's competitors were shifting away from the traditional telecommunications and cable providers to which ADT was accustomed, and towards large and swiftly expanding technology-based companies such as Google, Amazon, and Apple.

13.     Furthermore, the Registration Statement failed to provide certain metrics the Company released prior to going private in 2016, such as unit and revenue attrition, quarterly subscriber counts, and subscriber acquisition costs.  The Company also provided unrealistic projections of net income and earnings for fourth quarter and fiscal year 2017.

14.     The Company's IPO was completed on January 23, 2018.  Prior to the IPO, the Company was wholly-owned by the Apollo Defendants.  During the IPO, ADT sold 105 million

shares of common stock at $14.00 per share for total aggregate proceeds of approximately $1.47 billion.

15.     At the close of the IPO, the Apollo Defendants owned approximately 85.6 percent of the Company's stock.  Apollo retains control over ADT:  the Company is classified as a "controlled company" pursuant to NYSE rules and the federal securities laws, and the majority of ADT's directors were appointed by Apollo.

16.     On January 19, 2018, media reports began to circulate regarding the terms of ADT's settlement with Zonoff.  In response to the news that the Company would only receive a one-time payment of $25 million from Zonoff, ADT's share price dropped from $14 to close at $12.39 on January 19, 2018.

17.     The preliminary injunction against Ring was vacated on February 23, 2018, and on February 27, 2018, Amazon announced that it would acquire Ring for $1 billion.

18.     Between February 26, 2018 and February 28, 2018, the price of ADT shares dropped more than thirteen percent.

19.     Then, on March 15, 2018, the Company issued a press release in which it announced fourth quarter and fiscal year 2017 financial results.  The results were disappointing: ADT narrowly reached the low end of the income range that was included in the Registration Statement, but this was likely due solely to the one-time benefit of the reforms associated with the Tax Cuts and Jobs Act of 2017.  According to the press release, ADT reported a net income of $638 million for the fourth quarter of 2017, which included a $690 million tax benefit.

20.     ADT's share price has continued to drop since the IPO and is currently trading at $8.80 – a roughly 37% loss in value when compared to the IPO offering price.

21.   As a result of defendants' wrongdoing, the investing public was not provided with an accurate understanding of ADT's business, operations, and financial health.  Defendants made false and misleading statements, which they failed to correct, and also failed to ensure that the Company maintained adequate internal controls.  These breaches of defendants' fiduciary duties have caused, and continue to cause, harm to the Company.

22.   Furthermore, while the Company's stock price was artificially inflated as a result of the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations.  Approximately 4,203 of the Company's equity securities were repurchased between January 1 and January 31, 2018, for approximately $58,842.  The Company's stock was actually only worth $7.56 per share during that time – the Company overpaid for its own stock by approximately $27,067.

23.   The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected ADT, and many of its officers and directors, to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Florida, as well as a consolidated securities fraud class action lawsuit pending in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.  These lawsuits, internal investigations, losses due to the Company's overpayment of approximately $27,067 for the repurchases of its own stock, and the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company, will cost the Company millions of dollars.

24.   The Company has been substantially damaged as a result of the Individual Defendants' and Apollo Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

## JURISDICTION

25.     The Court has subject matter over the claims asserted under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this district, or is an individual who is either present in this district for jurisdictional purposes, or has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because (i) one or more of the Defendants either resides or maintains executives offices in this district; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this district; and (iii) Defendants have received substantial compensation and other transfers of money in this district by doing business and engaging in activities having an effect in this district.

## PARTIES

29.     Plaintiff is a current shareholder of ADT common stock and has continuously held ADT common stock at all relevant times.

***Nominal Defendant ADT***

30.     Nominal Defendant ADT is a Delaware corporation with its principal executive offices at 1501 Yamato Road, Boca Raton, Florida 33431.  ADT stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ADT."

*The Apollo Defendants*

31.        Apollo Global Management, LLC, a private equity firm, is a Delaware limited liability company headquartered in New York, New York.  Apollo took ADT private in 2016.  In January 2018, Apollo sponsored an initial public offering of ADT shares (the "IPO").   After completion of the IPO, Apollo held 641,114,368 shares of ADT common stock, representing an ownership share of approximately 85.6 percent.

32.        Prime Security Services TopCo Parent, L.P. ("TopCo"), is a Delaware limited partnership headquartered in Purchase, New York.  TopCo is affiliated with Apollo.

33.        Apollo Management Holdings, L.P., is a Delaware limited partnership headquartered in New York, New York.  It is affiliated with Apollo.

34.        Apollo Management Holdings GP, LLC, is a Delaware limited liability company headquartered in New York, New York.  It is affiliated with Apollo.

35.        Apollo Management, L.P., is a Delaware limited partnership headquartered in Purchase, New York.  It is affiliated with Apollo.

36.        Apollo Management GP, LLC, is a Delaware limited partnership headquartered in Purchase, New York.  It is affiliated with Apollo.

*The Individual Defendants*

37.        Defendant Timothy J. Whall ("Whall") has served as the Company's CEO and as a member of the Company's board of directors (the "Board") since 2016.  According to the Company's Annual Report on Form 10-K, filed with the SEC on March 15, 2018 (the "2017 10-K"), on March 8, 2018, Defendant Whall beneficially owned 572,282 shares of the Company's common stock and 672,351 Class A-2 Units of TopCo, representing 28.6% of all outstanding Class A-2 Units, for a total value of approximately $6.0 million in Company stock.

38.        In 2017, Defendant Whall received $1,937,419 in compensation from the Company.  This included $705,386 in salary, $254,208 in stock awards, $957,101 in non-equity incentive plan compensation, and $20,724 in all other compensation.

39.        Defendant James D. DeVries, ("DeVries") has served as the Company's President since May 2016.  According to the 2017 10-K, on March 8, 2018, Defendant DeVries beneficially owned 371,459 shares of the Company's common stock, and 100,903 Class A-2 Units of TopCo, representing 4.29% of all outstanding Class A-2 Units, valued at approximately $3.9 million.

40.        In 2017, Defendant DeVries received $1,726,150 in total compensation from the Company.  This included $513,078 in salary, a $466,299 bonus, $169,087 in stock awards, $563,160 in non-equity incentive plan compensation, and $14,526 in all other compensation.

41.        Defendant Jeffrey Likosar ("Likosar") has served as the Company's Executive Vice President, CFO and Treasurer since 2016.  According to the 2017 10-K, on March 8, 2018, Defendant Likosar beneficially owned 229,355 shares of the Company's common stock, and 88,795 Class A-2 Units of TopCo, representing 3.78% of outstanding Class A-2 Units.

42.        In 2017, Defendant Likosar received $1,903,211 in compensation from the Company.  This included $502,974 in salary, $537,078 in bonus, $173,254 in stock awards, $546,425 in non-equity incentive plan compensation, and $143,480 in all other compensation.

43.        Defendant P. Gray Finney ("Finney") has served as the Company's Senior Vice President, Chief Legal Officer and Secretary since May 2016.  As of July 10, 2018, Finney owns 345, 471 shares of ADT stock, through a combination of stock awards and purchases.

44.        Defendant Andrew D. Africk ("Africk") has served as a Company director since 2016 and is a member of the Board's Audit Committee.  According to the 2017 10-K, on

March 8, 2018, Defendant Africk beneficially owned 17,937 Class A-2 Units of TopCo, representing 0.7% of outstanding Class A-2 Units.

45.     In 2017, Defendant Africk received $100,000 in compensation from the Company.  This included $50,000 in fees earned or paid in cash and $50,000 in stock awards.

46.     Defendant Marc E. Becker ("Becker") has served as a Company director since 2016 and is the Chairman of the Board.

47.     Defendant Stephanie Drescher ("Drescher") has served as a Company director since 2017.

48.     Defendant Matthew H. Nord ("Nord") has served as a Company director since 2016.

49.     Defendant Eric L. Press ("Press") has served as a Company director since 2016.

50.     Defendant Reed B. Rayman ("Rayman") has served as a Company director since 2016 and is a member of the Audit Committee.

51.     Defendant David Ryan ("Ryan") has served as a Company director since 2016.

52.     Defendant Lee J. Solomon ("Solomon") has served as a Company director since 2016.

53.     Defendant Brett Watson ("Watson") served as a Company director from 2016 to July 25, 2018.

## THE INDIVIDUAL DEFENDANTS' DUTIES

54.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and are required to use their utmost ability to control and manage the Company in a

fair, just, honest, and equitable manner.  Defendants are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

55.      The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, directly and/or indirectly, exercised control over the wrongful acts complained of herein.

56.      As senior executive officers, directors, and/or controlling shareholders of a publicly-traded company, whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding ADT's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

57.      To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of ADT were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

d.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

e.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

f.      ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

58.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

59.     In addition, the Board has adopted a set of corporate governance principles which address the Board's governance role and functions to promote the functioning of the Board and its

committees and to set forth a common set of expectations as to how the Board should perform its

functions (the "Corporate Governance Principles").

60.    The Corporate Governance Principles include the following language:

ADT's company culture is built on the premises that the company seeks to draw the best from its employees, and that every employee, without exception, is responsible for the conduct and success of the enterprise.  This includes full, accurate, candid, and timely disclosure of information, and compliance with all laws and regulatory standards.  Employee responsibilities are elaborated in our Code of Conduct.  The Board is responsible for setting the ethical tenor for management and the company.  That ethical tenor works on the expectation that employees understand where the lines are that they should not cross and stay widely clear of those lines.  The Code of Conduct is reviewed periodically by all directors, officers and other employees, and they affirm in writing that they understand it and are fully in compliance with it.  All senior executives, including the chief executive, are evaluated and compensated in part on proactively promoting integrity and compliance.

61.    The Company has also established a Code of Conduct (the "Code"), which applies

to all ADT "team members and contractors" as well as all directors, officers, and employees.  The

Code states:

Conflicts of Interest

Conflicts of interest exist when your personal interests or activities interfere, or appear to interfere, with the interests of the company.  A conflict of interest affects your judgment, objectivity, or loyalty to ADT.  Such conflicts can arise in many different situations and relationships, and are not always obvious.  It is important that your decisions and actions be based on ADT's business needs – not what serves your own personal interests or those of a third party.  To make certain that we act in ADT's best interests, team members are required to disclose any actual or potential conflict of interest.  Even if you do not have an actual conflict, others may think you do.  To avoid even the appearance of a conflict, seek guidance from your manager, a human resources representative, the ADT Ethics Line, or the ADT Ethics Office.  The company will work with you to determine appropriate action.

*        *        *

Asset Protection

We create value for the company by using our expertise and company assets.  We commit to use and protect company assets appropriately and productively. Company assets include physical property, financial assets, proprietary

information, data, records, and intellectual property such as brands, inventions and copyrights. In dealing with ADT's assets, follow these guidelines:

- Use your best judgment when procuring assets for the company

- Use care when working with company assets

- Ensure company assets are protected from misuse or theft

- Only share company assets outside the company with prior authorization

- Comply with security requirements to safeguard physical property and other assets.

*     *     *

Recordkeeping and Reporting

As a team member, each of us is obligated to uphold all relevant financial accounting and reporting standards and regulations. Our financial records must be:

- Complete, accurate, and timely

- Properly supported and documented

- Fair and objective

- Shared only with proper authorization.

62.     The Individual Defendants violated both the Code of Conduct and the Company's Governance Principles by the wrongdoing described herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.     In committing the wrongful acts alleged herein, the Individual Defendants and Apollo Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants and Apollo Defendants caused the Company to conceal the truth and further aided and abetted and assisted each other in breaching their respective duties.

64.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants

and Apollo Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

65.     The Individual Defendants and Apollo Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  The actions described herein occurred under the authority of the Board, thus each of the Individual Defendants and Apollo Defendants who are directors of ADT was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

66.     Each of the Individual Defendants and Apollo Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of wrongdoing, each of the Individual Defendants and Apollo Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ADT and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### *Factual Background*

68.     ADT was formed in 1874, when fifty-seven telegraph delivery companies affiliated and became "American District Telegraph."  The Company has since grown into one of the largest

providers of security and monitoring services in the United States and Canada, with 18,000 employees serving approximately 7.2 million residential and business customers.

69.     ADT's famed monitored security and automation products and services include the installation and monitoring of residential and business security and automation systems, such as access controls, intrusion detection, and environmental hazard detection.

70.     As ADT's customers have begun to rely more heavily on web-enabled devices such as smartphones and tablets, so too have ADT's products.  The Company now offers products and services that allow customers to play a more active role in monitoring and controlling their security systems by providing them with the technology to access ADT's monitoring services through their personal devices.  This group of products and services is colloquially known as do-it-yourself ("DIY") and is considered by ADT to be part of a fast-growing market.

71.     In 2010, the Company launched ADT Pulse, which allows customers to control their security systems, thermostats, and lighting with their mobile devices.  Pulse also provides access to streaming video of a customer's property.

72.     Most of ADT's revenue generation comes from monthly payments on multi-year contracts for monitoring its security systems.  These contracts include the systems and their installation, as well as additional customer services provided by ADT, such as scheduled, preventative, and on-demand system maintenance.

73.     ADT has a cumbersome and immobile business infrastructure.  The Company has 200 sales and service offices throughout the U.S. and Canada, in addition to twelve monitoring centers, which operate twenty-four hours a day on a year-round basis and are serviced by thousands of employees.

74.     Thus, despite the size of its current customer base, ADT is subject to high levels of competition from companies that can offer similar or more advanced products, while incurring lower operating costs.

75.     One major ADT competitor is Ring, a company that sells video doorbells, security cameras, and alarm systems that connect directly to the customer's smart phone or mobile device through a web application.  All Ring products include the ability to access live video on demand, interact with visitors from a phone, and receive ring and motion alerts for free.  Those customers who wish to receive more services have a choice between a basic plan and "plus" plan – which includes professional alarm monitoring – both of which may be purchased on a monthly or annual upfront basis and do not require a long-term contract.[1]  Ring's transportable and cost-efficient products and services have an obvious appeal – after introducing its video doorbell in 2013, Ring gained one million users by 2017.

76.     Ring was acquired by Amazon on April 12, 2018, for $1 billion.  After the Amazon acquisition, Ring substantially decreased the purchase price of its products, thereby increasing the reach of its market by creating an affordable alternative to costly professional home security systems.  Ring's price cut represented a substantial competitive threat to ADT.

77.     The Company has responded to such competitive threats by introducing new products and software platforms.  In 2017, the Company launched ADT Canopy, which offered consumers a contract-free, month-to-month monitoring subscription service to accompany its physical security systems.

---

[1]  The basic plan is offered for $3 per month and the plus plan is offered for $10 per month.  Ring Website.  https://shop.ring.com/pages/protect-plans.

78.     In October 2017, ADT partnered with Samsung and released the Samsung SmartThings, ADT home-security system.  The self-install system allows users to add various detectors or alarms and provides optional ADT professional monitoring for an additional cost.

79.     At the time of ADT's IPO, ADT Canopy-compatible devices were limited to devices manufactured by Samsung, Honeywell, NETGEAR, and Apple.

### ADT's Collaboration with Zonoff

80.     Before launching Canopy or collaborating with Samsung, ADT entered into an ill-fated collaboration with Zonoff, which was, at the time, a promising smart home platform.[2]

81.     In November 2014, ADT entered into a series of transactions with Zonoff, aimed at facilitating collaboration between the two companies.  On November 5, 2014, ADT and Zonoff entered into a Master Services Agreement and a series of other agreements pursuant to which ADT made equity investments in, and large, secured loans to Zonoff.[3]  In exchange for its investment, ADT received a first-priority lien and security interest in all of Zonoff's assets, including intangible assets and intellectual property rights in a joint collaboration between the two companies called the Z1 Platform ("Z1").

82.     In developing Z1, ADT incorporated its own confidential, proprietary information, such as the Company's specialized knowledge of professional monitoring.  Because of the value of ADT's proprietary information, the agreement between the two companies prohibited Zonoff or its employees from using ADT's confidential information to:  "(i) compete directly or indirectly with [the Company]; or (ii) interfere with any actual or proposed business of [the Company]."  It

---

[2]  Smart home platforms, or smart home as a service (SHaaS) platforms, allow users to control various aspects of their home environments (lighting, temperature, security) from their mobile devices.

[3]  *ADT Holdings, Inc. v. Michael Harris, et al.*, C.A. No. 2017-0328-JTL, ¶¶ 29-50 (Del. Ch. May 3, 2017).

also obliged Zonoff and its employees not to "disclose or otherwise make available any of the Confidential Information to anyone," except individuals "who need to know the Confidential Information for the purpose of meeting [Zonoff's] obligations under" the agreement.[4]

83.    According to the agreement, ADT owned the Z1 platform and retained the right to demand the "return or destruction" of Z1.  Zonoff retained the rights to any of its own pre-existing technology used in developing the platform.

84.    Zonoff began to experience financial difficulties.  When it could not pay its outstanding debt to third-parties, ADT agreed to satisfy some of Zonoff's development-related debts.  Zonoff continued to receive financial assistance from ADT between April 2015 and November 2016.  By January 17, 2017, ADT had spent $36 million on its collaboration with Zonoff.

85.    In January 2017, Zonoff CEO, Michael Harris ("Harris"), without notifying ADT, began to negotiate with Ring to secure positions for himself and seventeen other Zonoff employees in the event that Zonoff could no longer operate as a going concern.  One of Harris' main bargaining chips was the potential for Ring to acquire Z1 and hire the platform's development team.

86.    On March 2, 2017, Zonoff abruptly shut its doors.  Ring quickly hired Harris and much of the Zonoff staff, leased Zonoff's offices, and gained access to the Z1 Platform.

87.    As a result of its previous agreements with Zonoff, ADT was able to access the Z1 Platform software and associated documentation, which provided evidence of Harris' prior negotiations with Ring.  The documents also revealed that Ring was planning to integrate Z1 into

---

[4]  *ADT Holdings, Inc. v. Michael Harris*, ¶ 40 (citing Section 10.1 of the Master Services Agreement, 7-8).

its own alarm system designed to compete directly with ADT.  Ring had begun developing this product in 2016 and had engaged Zonoff to secure a platform to support Ring's alarm system.

88.   Ring's acquisition of Z1 was a tremendous boon to its business as it allowed Ring to access the professionally monitored home security market without the usual accompanying costs.  Ring's CEO later confirmed this competitive edge, stating that Ring's ability to be the first to market with such a product was worth "a billion dollars."  The price of Ring's system also posed a substantial competitive threat to ADT.  Ring offered a system price point of $199 and a $10 monthly charge for monitoring services, well below ADT's monthly price of between $30 and $60.

### Zonoff Litigation

89.   On May 3, 2017, ADT commenced an action against Zonoff [and others?] in the Delaware Chancery Court (the "Zonoff Action') asserting claims for, *inter alia*, misappropriation of trade secrets, tortious interference with a contractual relationship, conversion, fraudulent transfer, and breaches of fiduciary duties.

90.   With respect to Ring's possession of Z1, ADT's complaint stated:

Ring wrongfully maintains possession of the Z1 Platform, a product designed and developed for ADT and in which ADT invested substantial funds, to use in competition with ADT. . . . Ring's continued possession and use of the Z1 Platform is causing and will continue to cause ADT irreparable injury, including, but not limited to, the material and substantial impairment of ADT's rights and interest in and to the Z1 Platform [and] the protection of its trade secrets therein . . . .

91.   ADT refused to settle the case for an initial offer of $12.5 million, and the case went to trial on September 18, 2017.

92.   On October 2, 2017, Ring debuted a new product called "Ring Protect," a home security system, using the Z1 Platform, with the ability to be professionally monitored much like the products traditionally offered by ADT.

93.     On October 9, 2017, ADT sought a preliminary injunction to prevent Ring from selling any products based on the Z1 Platform.  ADT's motion in support of the preliminary injunction made clear that the loss of Z1 was material to ADT and posed a significant threat to the Company:

> The allegation that this product competes with ADT is not speculative, it is expressly confirmed by Ring's own marketing materials. Ring not only compares its product to ADT's Pulse offering, but specifically touts the savings consumers can realize by using "Ring Protect" rather than Pulse.
>
> *       *       *
>
> [Ring] received a two-year, $50 million head start on its entry into the professionally monitored segment of the home security industry [as] a direct result of Ring's wrongful taking of ADT's source code . . . . Ring [was] able to skip over the trials and errors, the resources consumed, and hours devoted by companies like ADT to put out a competing product in a fraction of the time, using technology developed and paid for by ADT.

94.     At a November 2, 2017, hearing on the motion for preliminary injunction, counsel for ADT iterated the irreparable harm to ADT's business as a result of Ring's acquisition of Zonoff:

> This is a new field, a new product category, professionally monitored DIY home security tied into the smart home. Mr. Siminoff testified he believes Nest, which is Google, jumped into the space specifically because they heard Ring was getting into the space. This is the Christmas season where people are going to establish market share. He who comes out in January with market share is operating from the high ground and is getting brand recognition. That means it's not a one-to-one issue; it's not as if Ring gets a sale, my client lost a sale. Its someone who is going to get a sale, someone who is going to get elevated with brand recognition, and someone is going to get market share, and that's very hard to claw back. That's not easily compensated or even determined from the compensation standpoint. Had this hearing been in July, Ring would never have released its product. It released it because has to get on the shelves for the holidays.

95.     The court granted the preliminary injunction.  The court's order found that, absent the injunction, ADT would suffer irreparable harm:

I think there is irreparable harm to ADT . . . . I think it is reasonably probable that Ring should not have been using the escrow materials for the purposes they were using them for.

So, it's one thing to say – and I agree – that ADT doesn't have a right to avoid competition. But it's another thing when that competitor has emerged by virtue of the misuse of someone else's property, which is what there's a reasonable probability of success and good reason to think happened here.

Given that predicate, I think there is irreparable harm to ADT.

96.     On December 15, 2017, the parties announced that they reached a settlement in principle.  However, as of the day of ADT's IPO, on January 19, 2018, the parties were still in the process of finalizing the terms of the settlement.

97.     A settlement was reached on February 23, 2018, and the preliminary injunction against Ring was lifted.  According to news sources, Ring agreed to pay ADT $25 million, and in return was free to use Z1 in its future products.

*ADT's Materially False and Misleading Registration Statement*

98.     The SEC has provided companies with very specific guidance regarding the necessary disclosures to be included in a registration statement.  The SEC routinely emphasizes the importance of providing investors with information on risk factors faced by the company.

99.     Item 303 of SEC Regulation S-K, 17 C.F.R. §§ 229.303(a)(3)(ii) & (b) ("Regulation S-K"), requires that a proxy statement disclose, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

100.     Regulation S-K further requires that the registration statement disclose and "focus specifically" on material events and uncertainties that would affect the historical financial information about the Company in such a way that it would no longer be indicative of future operating results.  Such information includes both "matters that would have an impact on future

operations and [matters that] have not had an impact in the past." The instructions in Regulation S-K state, in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

101.    On December 19, 2003, the SEC issued another interpretive release to Item 303 of Regulation S-K (the "2003 Interpretive Release"). The 2003 Interpretive Release established that the Registration Statement was required to disclose known demands, events, or uncertainties, except for those that management determined: (1) were not reasonably likely to occur; or (2) would not have a material effect on the Company's operating results. The 2003 Interpretive Release states, in pertinent part:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

102.    Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503 requires, in the "Risk Factor" section of the Registration Statement, a "discussion of the most significant factors that make the offering speculative or risky." Each risk factor must adequately describe the risk.

103.    Item 101 of SEC Regulation S-K, 17 C.F.R. § 229.101(c)(x) requires the disclosure of competitive conditions:

> Competitive conditions in the business involved including, where material, the identity of the particular markets in which the registrant competes, an estimate of the number of competitors and the registrant's competitive position, if known or reasonably available to the registrant. Separate consideration shall be given to the principal products or services or classes of products or services of the segment, if any. Generally, the names of competitors need not be disclosed. The registrant may include such names, unless in the particular case the effect of including the names

would be misleading. Where, however, the registrant knows or has reason to know that one or a small number of competitors is dominant in the industry it shall be identified. The principal methods of competition (e.g., price, service, warranty or product performance) shall be identified, and positive and negative factors pertaining to the competitive position of the registrant, to the extent that they exist, shall be explained if known or reasonably available to the registrant.

104.     On September 28, 2017, ADT filed a confidential draft Registration Statement with the SEC on Form S-1.  The SEC responded to the Company with a series of comments that emphasized the importance of adequately disclosing material trends and risk factors.

105.     ADT made a number of amendments, and on January 17, 2018, the Company filed its final amendment to the Registration Statement, in which it registered 105 million shares of ADT common stock.  The final amendment was signed by Whall, Likosar, Becker, Rayman, Nord, Africk, Press, Solomon, Drescher, Watson, Ryan, and Finney, and formed the basis for the Company's IPO.

***Materially False and Misleading Statements***

106.     According to the Registration Statement, ADT underwent a "transformation," which resulted in a "'New ADT' with a substantially improved customer experience and operating culture" and which "combined the brand, history, and scale of legacy ADT with [enhanced] customer service and operational excellence . . . to create an industry leader with the broadest portfolio, largest scale, and leading financial and operating metrics."  The Registration Statement also noted that a "new management team has notably improved customer retention, reduced customer acquisition costs and improved profitability" and that "these strategies have already delivered significant improvements in operational and financial results."

107.     The Registration Statement painted an overwhelmingly positive picture of the Company, including the following metrics:

**Improved Operational and Financial Metrics.** Comparing pre-acquisition Legacy ADT (as defined below) for its fiscal year ended September 25, 2015 to

post-acquisition Legacy ADT (as defined below) in the trailing twelve-month period ended September 30, 2017, we reduced gross customer revenue attrition from 16.5% to 13.9%. In addition, in comparing pre-acquisition Legacy ADT for its fiscal year ended September 25, 2015 to the post-acquisition Company in the trailing twelve-month period ended September 30, 2017, we increased Adjusted EBITDA margins as a percentage of monitoring and related services revenues from 54.1% to 57.6%, and we reduced the customer revenue payback period from 2.7 years to 2.5 years. We also reduced total net capital expenditures as a percentage of Adjusted EBITDA and improved our cash flow.

*       *       *

**Reduced Customer Revenue Attrition.**   As a result of a combination of (i) increased discipline related to the credit quality of the new customers we acquire, including the expansion of credit scoring metrics to substantially all new customers, (ii) improved customer service, especially in the speed of our responsiveness in our call centers and field operations, and (iii) a technology-driven product and service offering that increases customer contact and allows us to provide tailored offerings, we have improved annual customer revenue attrition at legacy ADT by more than two and a half percentage points since the consummation of the ADT Acquisition. Customer revenue attrition is one of the most important drivers of value creation in security monitoring businesses, and based on our estimates every one-percentage point improvement in attrition frees up more than $100 million of cash flow we would otherwise need to spend to replace those lost customers.

108.    The Registration Statement also included information about purportedly potential risks to the Company.  However, 'potential' was a misnomer as the acts underlying the risks had already occurred at the time of the IPO.  For example:

### *U.S. federal income tax reform could adversely affect us.*

On December 22, 2017, President Trump signed into law H.R. 1, originally known as the "Tax Cuts and Jobs Act," . . . .  The new legislation, among other things, includes changes to U.S. federal tax rates, imposes significant additional limitations on the deductibility of interest, allows for the expensing of capital expenditures, and puts into effect the migration from a "worldwide" system of taxation to a territorial system. . . . Our net deferred tax assets and liabilities will be revalued at the newly enacted U.S. corporate rate, and the impact will be recognized in our tax benefit for the year ending December 31, 2017. The impact on the year ended December 31, 2017 and on future years may be material to the consolidated financial statements.  We continue to examine the impact this tax reform legislation may have on our business. . . .

109.   The Company also misleadingly listed as a potential risk, "our ability to successfully offer, develop, enhance, and/or introduce products that keep pace with evolving technology related to our business."  At the time that the Registration Statement was released, this was not a potential risk, but one that had already come to fruition.

110.   The Registration Statement provided "preliminary estimated ranges" for the Company's financial results for the year ended December 31, 2017 ("FY 2017").  These included a range for FY 2017 net income of between $86.8 million to $550.8 million, and the Registration Statement asserted that "[w]e have presented preliminary estimated ranges of certain of our financial results [] for the year ended December 31, 2017 based on information currently available to management."  The Registration Statement added the caveat that the Company's "actual results for the year ended December 31, 2017 may differ materially from the preliminary estimated financial results."

111.   The Registration Statement included a section on future investments in new business, which failed to disclose any information about the Company's investment in Zonoff, the subsequent litigation, and eventual loss of vital proprietary information.  ADT instead opted for a vague statement:

> We have invested and will continue to invest in new businesses, products, services, and technologies beyond traditional security and interactive services. Our investments may involve significant risks and uncertainties, including capital loss on some or all of our investments, insufficient revenues from such investments to offset any new liabilities assumed and expenses associated with these new investments, distraction of management from current operations, and issues not identified during pre-investment planning and due diligence that could cause us to fail to realize the anticipated benefits of such investments and incur unanticipated liabilities. Since these investments are inherently risky, these new businesses, products, services, and technologies may not be successful and as a result, may materially adversely affect our reputation, financial condition, and results of operations.

112.    At the time that the Registration Statement was released publicly, ADT was still involved in settlement negotiations with Ring to resolve the Zonoff Action.   However, the Registration Statement failed to mention the Zonoff Action, stating:

> The Company is subject to various claims and lawsuits in the ordinary course of business, including from time to time, contractual disputes, employment matters, product and general liability claims, claims that the Company has infringed on the intellectual property rights of others, claims related to alleged security system failures, and consumer and employment class actions. In the ordinary course of business, the Company is also subject to regulatory and governmental examinations, information requests and subpoenas, inquiries, investigations, and threatened legal actions and proceedings. In connection with such formal and informal inquiries, the Company receives numerous requests, subpoenas, and orders for documents, testimony, and information in connection with various aspects of its activities. The Company has recorded accruals for losses that it believes are probable to occur and are reasonably estimable. While the ultimate outcome of these matters cannot be predicted with certainty, the Company believes that the resolution of any such proceedings (other than matters specifically identified below), will not have a material adverse effect on its financial position, results of operations, or cash flows.

113.    The list of cases identified in the Registration Statement did not include the Zonoff Action.  In fact, the Registration Statement did not mention the significant impact that the Zonoff Action and Ring's subsequent entry into ADT's largest market would have on the Company. Presumably, ADT learned a great deal about the nature of the risks posed to the Company by start-ups and other fierce competitors through the pendency of the Zonoff Action.   However, the Registration Statement was entirely devoid of such information, and merely stated:

> [W]e are currently and may in the future become subject to legal proceedings and commercial or contractual disputes. These are typically claims that arise in the normal course of business including, without limitation, commercial or contractual disputes with our suppliers, intellectual property matters, third party liability, including product liability claims and employment claims. There is a possibility that such claims may have a material adverse effect on our results of operations that is greater than we anticipate and/or negatively affect our reputation.

114.    The Registration Statement's section on intellectual property rights was similarly amnesiac, and stated:

**Infringement of our intellectual property rights could negatively affect us.**

We rely on a combination of patents, copyrights, trademarks, trade secrets, confidentiality provisions, and licensing arrangements to establish and protect our proprietary rights. We cannot guarantee, however, that the steps we have taken to protect our intellectual property rights will be adequate to prevent infringement of our rights or misappropriation of our intellectual property or technology . . . while we enter into confidentiality agreements with certain of our employees and third parties to protect our intellectual property, such confidentiality agreements could be breached or otherwise may not provide meaningful protection for our confidential information, trade secrets and know-how related to the design, manufacture, or operation of our products and services. If it becomes necessary for us to resort to litigation to protect our intellectual property rights, any proceedings could be burdensome and costly, and we may not prevail. Further, adequate remedies may not be available in the event of an unauthorized use or disclosure of our confidential information, trade secrets, or know-how. If we fail to successfully enforce our intellectual property rights, our competitive position could suffer, which could materially adversely affect our business, financial condition, results of operations, and cash flows.

115.   The section of the Registration Statement regarding competition to ADT made no mention of the threat to the Company of specific new market entrants such as Ring, Google, Apple, Amazon, and DIY services.   Despite ADT's intimate familiarity with the risks of new and aggressive competitors, the Company stated:

Technology trends are creating significant change in our industry. Innovation has lowered the barriers to entry in the interactive services and automation market, and new business models and competitors have emerged. We believe that a combination of increasing customer interest in lifestyle and business productivity and technology advancements will support the increasing penetration of the interactive services and automation industry. We are focused on extending our leadership position in the monitored security industry while also growing our share of the fast-growing interactive automation industry. The security systems market in the United States and Canada remains highly competitive and fragmented, with a number of major firms and thousands of smaller regional and local companies. The high fragmentation of the industry is primarily the result of relatively low barriers to entering the business in local geographies and the availability of wholesale monitoring (whereby smaller companies outsource their monitoring to operations that provide monitoring services but do not maintain the customer relationship). We believe that our principal competitors within the security systems market are Johnson Controls International plc., Vivint, Inc., Stanley Security Solutions, a subsidiary of Stanley Black and Decker, MONI, a subsidiary of Ascent Capital Group, Inc. and Comcast Corporation.

116.    The competitors that ADT listed in its Registration Statement are all of the same bulky, traditional model as ADT.

117.    When ADT finally acknowledged companies such as Amazon and Honeywell in the Registration Statement, the Company classified them as growth opportunities, thereby casting any potential relationship in an entirely positive light:

**Attractive Growth Opportunities.**

We are well-positioned to drive growth in our residential channel by leveraging ADT's brand and scale and our renewed focus on the customer experience. We are also well-positioned to drive growth in our commercial and multi-site customer channels as a result of these factors coupled with Protection One's strong existing commercial and multi-site customer base and expertise. In addition, we have attractive growth opportunities for complementary products and services, including through partnerships with leading technology firms such as Honeywell, Samsung, Amazon, Life 360, and Cisco Meraki. These partnerships collectively extend our presence to new channels (including DIY, retail, and e-commerce) and new and complementary offerings in automation, cyber security, and mobile on-the-go applications.

\*        \*        \*

We expect a growing opportunity to expand from our core business to drive growth in adjacent markets, capitalizing on our core expertise and monitoring and service capabilities—along with our brand strength and high degree of customer trust—to expand our addressable market. We intend to pursue additional opportunities in adjacent markets, including through potential selective acquisitions.

\*        \*        \*

We have made substantial progress in the development of numerous potential growth areas for our Company, including: leveraging Protection One's history in the commercial market to continue building a world-class commercial security business; expanding our total addressable market by leveraging the ADT brand to bring security monitoring to innovative new customer experiences and offerings, evidenced by progress in developing cyber security and our new on-the-go mobile offerings; and continuing to take advantage of our status as a "partner of choice" to leading technology companies, evidenced by our recently announced partnership with Amazon.

118.    When the Company mentioned the potential threat of DIY products, the Registration Statement used hypothetical language, which gave the misleading impression that the Company was out ahead of the threat:

> We sell our products and services in highly competitive markets, including the home automation market, which may result in pressure on our profit margins and limit our ability to maintain or increase the market share of our products and services.

*       *       *

> We also face potential competition from DIY products, which enable customers to self-monitor and control their environments without third-party involvement through the Internet, text messages, emails, or similar communications, but with the disadvantage that alarm events may go unnoticed. Some DIY providers may also offer professional monitoring with the purchase of their systems and equipment without a contractual commitment, which may be attractive to some customers and put us at a competitive disadvantage. Other DIY providers may offer new IoT devices and services with automated features and capabilities that may be appealing to customers. Shifts in customer preferences towards DIY systems could increase our attrition rates over time and the risk of accelerated amortization of customer contracts resulting from a declining customer base. It is possible that one or more of our competitors could develop a significant technological advantage over us that allows them to provide additional service or better quality service or to lower their price, which could put us at a competitive disadvantage. Continued pricing pressure, improvements in technology, and shifts in customer preferences towards self- monitoring or DIY could adversely impact our customer base and/or pricing structure and have a material adverse effect on our business, financial condition, results of operations, and cash flows.

*       *       *

> Our future growth is dependent upon our ability to keep pace with rapid technological and industry changes in order to develop or acquire new technologies for our products and service introductions that achieve market acceptance with acceptable margins.

> Our business operates in markets that are characterized by rapidly changing technologies, evolving industry standards, potential new entrants, and changes in customer needs and expectations. For example, a number of cable and other telecommunications companies and large technology companies with home automation solutions offer interactive security services that are competitive with our products and services. If these services gain greater market acceptance and traction, our ability to grow our business, in particular our ADT Pulse and other interactive service offerings, could be materially and adversely affected.

30

Accordingly, our future success depends in part on our ability to accomplish the following: identify emerging technological trends in our target end- markets; develop, acquire, and maintain competitive products and services that capitalize on existing and emerging trends; enhance our existing products and services by adding innovative features on a timely and cost-effective basis that differentiates us from our competitors; sufficiently capture intellectual property rights in new inventions and other innovations; and develop or acquire and bring products and services, including enhancements, to market quickly and cost-effectively.

119.    The Registration Statement went on to state:

In addition, our competitors may introduce superior products or business strategies, impairing our brand and the desirability of our products and services, which may cause customers to defer or forego purchases of our products and services, and impacting our ability to charge monthly service fees. If our competitors implement new technologies before we are able to implement them, those competitors may be able to provide more effective products than ours, possibly at lower prices. Any delay or failure in the introduction of new or enhanced solutions could harm our business, results of operations and financial condition. In addition, the markets for our products and services may not develop or grow as we anticipate.

120.    The Registration Statement further described risks related to increased competition, increased pricing pressure, or reduced market share that could have a materially adverse impact on the Company's business, financial condition, results of operations, and cash flows, stating, in relevant part:

We face competition from cable and telecommunications companies that are actively targeting the home automation and monitored security market, as well as from large technology companies that are expanding into the connected home market either through the development of their own solutions or the acquisition of other companies with home automation solution offerings. This increased competition could result in pricing pressure, a shift in customer preferences towards the services of these companies, reduce our market share and make it more difficult for us to compete on brand-name recognition and reputation. Continued pricing pressure from these competitors or failure to achieve pricing based on the competitive advantages previously identified above could prevent us from maintaining competitive price points for our products and services resulting in lost customers or in our inability to attract new customers and have a material adverse effect on our business, financial condition, results of operations, and cash flows.

121.    The statements referenced above in ¶¶ 106-120 were materially false and misleading because they failed to disclose material adverse facts pertaining to the Company's

business, operations, prospects, and legal compliance, which were known to the Individual Defendants and Apollo Defendants or recklessly disregarded by them.

122.     Specifically, Defendants failed to disclose the true nature of ADT's relationship with Zonoff and the Z1 Platform, including the known uncertainty associated with the Zonoff Action and that ADT's proprietary information and code were disclosed to Ring, thereby allowing Ring to compete directly with ADT.

123.     Defendants also failed to disclose material information about ADT's business prospects and competitive challenges, including:  (1) ADT's lack of a material foothold in the DIY home security market; (2) that Ring was soliciting ADT's customers by marketing its alarm product as a replacement for ADT Pulse; (3) Ring's market share grab was not speculative; (4) that competition had shifted from cable and telecommunication companies to technology companies like Google, Amazon, and Apple; (5) ADT was not a "partner of choice for leading technology companies," as evidenced by Amazon's acquisition of Ring shortly after the IPO; and (6) attractive growth opportunities for complementary products and services through partnerships with leading technology firms did not exist, nor would any then current partnership expand ADT's presence into new channels.

124.     Additionally, Defendants made false and/or misleading statements and or failed to disclose material information relating to the Company's IPO, including:  (1) certain factors made the IPO more speculative and risky than the Registration Statement disclosed; (2) the Registration Statement referred to a number of material trends and results that had already manifested, as potential risks; and (3) the estimated ranges for the then-complete 2017 fiscal results in the Registration Statement were unrealistic based on the financial results from the 2017 fiscal year.

*The Truth Emerges*

125.    ADT launched its IPO on January 19, 2018.  The news media wasted no time in reporting the suspected terms of ADT's settlement, specifically that the Company would relinquish its rights to the Z1 Platform to Ring in exchange for $25 million.

126.    The market responded to this news immediately:  ADT shares dropped from an initial offering price of $14 to close at $12.39 on the first day of trading – a drop of $1.61 or 11.5%.

127.    Analysts offered a variety of explanations for ADT's poor performance.  Allison Prang of Dow Jones Institutional News noted that, "[p]otential investors had said they were concerned about the company's ability to retain customers and attract new ones amid competition from new entrants including the video-doorbell company Ring."

128.    On February 13, 2018, Imperial Capital criticized the lack of transparency in the Registration Statement:

> ADT is providing less granular metric transparency than previous iterations of the company. The market may be less forgiving of "missed" quarters without the ability to investigate individual metrics than before. Ultimately, we would like to see ADT provide more details in its filings, including greater divisional data on residential and commercial industrial, average revenue, and cost to serve per subscriber, the take rate of Pulse, performance of the organic ADT business on measures like revenue growth and attrition.

129.    In a February 17, 2018 article for MarketWatch.com, analyst Shlomo Rosenbaum of Stifel echoed Imperial Capitals concerns:

> Analyst Shlomo Rosenbaum compared what is the same at ADT as compared with when it was public before with what has changed and found it no longer makes certain disclosures that would clearly help understand the state of the underlying business.

> For example, the company used to provide unit and revenue attrition metrics, but now only provides gross customer revenue attrition, he said. Subscriber counts were provided on a quarterly basis in the past, but are not provided at all now.

"We believe the subscriber base in terms of units has been shrinking," he wrote.

\*        \*        \*

Gross additions were another feature of quarterly reports with a breakdown of how many came from the dealer channel and how many from the internal channel, said Rosenbaum. The company is no longer providing an update of subscriber acquisition costs. And its debt levels have significantly increased thanks to the LBO, he said.

"Since the key drivers of the business are subscriber acquisition costs, average revenue per subscriber (or recurring monthly revenue, also know[n] as RMR), and attrition, we believe it is tough to gauge what is really going on in the business from public filings," said Rosenbaum[.]

130.    ACT announced the settlement of the Zonoff Action on February 23, 2018.  Just four days later, on February 24, 2018, Amazon announced that it had entered into an agreement to purchase Ring for $1 billion.

131.    Amazon's acquisition of Ring meant that Amazon was poised to be a serious ADT competitor.  This fact did not escape analysts' attention.  On February 27, 2018, Wedbush Securities analyst, Michael Pachter, suggested that ADT "could be the biggest loser" as Ring's "camera technology is far superior to physical security . . . With Amazon having roughly 100 million Prime members, that's a big addressable market for them to start selling this into."  A February 28, 2018, report from Morgan Stanley also noted that if Amazon brought professional monitoring to Ring's home automation products, ADT would be at even greater risk.

132.    Investors responded in kind and ADT's shares dropped to $10.55 on February 28, 2018 – a $3.45 drop from its IPO offering price just five weeks earlier.

133.    Then, on March 15, 2018, ADT issued a press release in which it announced disappointing financial results for fiscal year and third quarter 2017.  ADT received a one-time influx of $690 million as a result of the tax reforms, but was otherwise operating at a loss. Excluding the tax benefit, ADT disclosed diluted earnings per share of negative $0.06 for the

quarter and negative $0.35 for the year.  The press release provided the following results for the year and quarter:

> On a full year basis, the Company reported total revenue of $4,316 million and M&S Revenue of $4,029 million, up 4% and 2%, respectively, when compared to 2016 pro forma results.  Adjusted EBITDA increased by $176 million, or 8%, to $2,353 million. Net income was $343 million, up from a net loss of $285 million, and diluted earnings per share of $0.53, up from $(0.44) last year. Excluding special items, diluted earnings per share for the year was $(0.35) compared to $(0.20) in 2016.  Operating cash flow was $1,592 million, up 39% year-over-year, and free cash flow before special items was $403 million, up from $331 million in 2016.
>
> *       *       *
>
> The Company reported net income of $638 million, up from negative $85 million last year, and diluted earnings per share of $0.99 versus $(0.13) in the prior year. Excluding special items, diluted earnings per share was $(0.06) versus $(0.07) in the same period last year.  The net income results include a $690 million tax benefit due to the 2017 Tax Reform.

134.    On March 15, 2018, ADT hosted an earnings call with analysts and investors. During the call, analysts questioned Whall about the threat of new tech offerings and the potential impact of Amazon's acquisition of Ring.  Defendant Whall attempted to characterize the expanded DIY offering as positive, but he admitted that while past competition was from cable and telecommunications companies, there had been "a little change in the competitive landscape." With respect to new products from the tech sector, Defendant Whall acknowledged that Google, Amazon, and Apple were "coming out more on the hardware side and kind of getting things started with a more DIY offering."

135.    Defendant Whall made multiple attempts to maintain a sense of optimism and progress at ADT, but analysts were unconvinced and continued to note the myriad pressures faced by ADT from the DIY market.  A Barclays analyst, for example, asked whether "emerging competitive threats [including from] (Amazon/Ring)" contributed to ADT's disappointing post-

IPO performance, and noted that "investor's skittishness tied to the [Amazon] threat does not appear to be going away any time soon."

136.    On March 15, 2018, Investor's Business Daily published an article referring to "Alarming Numbers" and a "Surprise Loss" at ADT:

> Home security company ADT Inc. (ADT) reported a surprise adjusted loss for the fourth quarter, its first quarterly report since coming public in January. . . .  Analysts had expected earnings of 14 cents per share on revenue of $1.09 billion . . . But ADT lost 6 cents a share excluding one-time items.

137.    MarketWatch.com also published an article on March 15, 2018, which stated:

> [T]he company posted a surprise adjusted loss for the fourth quarter. ADT said it had net income of $638 million, or 99 cents a share, for the quarter, after a loss of $85 million, or 13 cents a share, in the year-earlier period. The number included a $690 million tax benefit from the December tax revamp. Excluding special items, however, the company had a loss of 6 cents a share, while the FactSet consensus was for EPS of 10 cents. The news overshadowed a small revenue beat.

138.    On this news, the price of ADT shares fell nearly 14.5%, or $1.48 per share, from the closing price on March 14, 2018, to close at $8.73 per share on March 16, 2018.

139.    As of the time of filing this complaint, ADT shares had not traded at or above $14 per share since the IPO.

***Repurchases***

140.    During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to repurchase its equity securities at artificially inflated prices, which substantially damaged the Company.

141.    The Individual Defendants caused the Company to pay $14.00 per share for 4,203 equity securities between January 19, 2018, and June 30, 2018, at a total cost to the Company of $58,842.  The Company stock was actually worth only $7.56 per share (the price at closing on March 27, 2018) resulting in an overpayment by the Company of approximately $27,067.

142.     According to the Company's Form 10-Q filed with the SEC on May 9, 2018, between January 1 and January 31, 2018, the Individual Defendants "approved the repurchase of 4,203 equity securities from two former employees at the initial public offering price of $14.00 per share used in [ADT's] initial public offering," for a total cost to the Company of approximately $58,842.

143.      Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid an average premium of $6.44 for each share during the period of January 1 to January 31, 2018.  Thus, the total over payment by the Company for the repurchase of its own equity securities during the period was approximately $27,067.

144.     In total, the Company overpaid an aggregate amount of approximately $27,067 for repurchases of its own equity securities during the time period in which the Company made false and misleading statements and omissions.

## DAMAGES TO ADT

145.     As a result of the Individual Defendants' wrongful conduct, ADT disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated ADT's credibility. ADT has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

146.     Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected ADT to a lawsuit for violations of the federal securities laws pending in this Court, captioned *Perdomo v. ADT Inc. et al.*, 9:18-cv-80668 (the "Securities Class Action").

147.     As a direct and proximate result of the Individual Defendants' actions, ADT stands to expend millions of dollars in legal fees and payments, in addition to the excessive compensation

and benefits that were paid to the Individual Defendants while they were breaching their fiduciary duties to the Company.

148.    Moreover, these actions have irreparably damaged ADT's corporate image and goodwill.  For at least the foreseeable future, ADT will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ADT's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DERIVATIVE AND DEMAND ALLEGATIONS

149.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

150.    Plaintiff brings this action derivatively in the right and for the benefit of the company to redress the Individual Defendants' breaches of fiduciary duties.

151.    Plaintiff is an owner of ADT common stock and was an owner of ADT common stock at all times relevant hereto.

152.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

153.    As a result of the facts set forth herein, Plaintiff has not made any demand on the ADT Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

154.    At the time this action was commenced, the Board consisted of ten directors: defendants Whall, Africk, Becker, Drescher, Nord, Press, Rayman, Ryan, and Solomon (the "Director Defendants") and non-party, Matthew E. Winter.  All Director Defendants are incapable

of making an independent and disinterested decision to institute and vigorously prosecute this action.

155.    The Apollo Defendants control ADT and have appointed a majority of the Board members.   Only two of the ten Board members have been designated by the Company as independent:  defendant Africk and Matthew Winter.

156.    Six of the Director Defendants have close business associations with the Apollo Defendants, which collectively control 85.6% of the Company's stock and owned all the Company's stock at the time of the IPO.  These six Director Defendants were appointed to the Board by Apollo and comprised the majority of the 10-director Board at the time of the IPO. Director Defendants Becker, Drescher, Nord, and Press are Senior Partners at Apollo, Rayman is a Principal at Apollo, and Solomon is a Senior Partner at Apollo Private Equity.  As a result of their employment and/or membership with the Apollo Defendants or affiliates thereof, Becker, Drescher, Nord, Press, Rayman, and Solomon are beholden to the Company's controlling shareholder.  The Apollo Defendants face a substantial likelihood of liability as they are named as defendants the State Securities Class Action, and Apollo faces further liability as it is named in the Federal Securities Class Action.   Thus, Director Defendants Becker, Drescher, Nord, Press, Rayman, and Solomon cannot independently or disinterestedly consider a demand to take action against the Apollo Defendants.

**I.      Demand is Futile as to all Director Defendants Because They Face a Substantial Likelihood of Liability**

157.    The Director Defendants face a substantial likelihood of liability for their individual misconduct.   The Director Defendants were directors throughout the time of the false and misleading statements referenced above, and as such had a fiduciary duty to ensure that the

Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

158.    Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of ADT.

159.    The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties have resulted in the Director Defendants facing a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of ADT to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

## II.    Demand is Futile as to Defendant Whall

160.    Whall is the CEO of ADT and a Company Director.  He has held these positions since 2016.  ADT provides Defendant Whall with his principal occupation from which he receives substantial compensation, including over $1.9 million in fiscal year 2017.  Thus, as the Company admits, Defendant Whall a non-independent director.

161.     Defendant Whall's large holding in Company stock, worth over $6 million before the fraud was fully exposed, evidences his interest in ensuring that the Company's stock price remains as high as possible.

162.     As the Company's highest officer and as a trusted Company director, Defendant Whall conducted little, if any, oversight of the Company's internal controls.  He consciously disregarded his duties to monitor such controls over reporting and he consciously disregarded his duties to protect corporate assets.  Additionally, Whall was ultimately responsible for the false and misleading statements and omissions that were made, including those contained in the Registration Statement referenced herein, which he signed.

163.     Furthermore, Defendant Whall is a defendant in both the Federal Securities Class Action and the State Securities Class Action.  Whall's family is also deeply intertwined with the business of ADT:  his brother has an ownership interest in Professional Resources International, which the Company pays $14,000 per month to for staff recruiting services, and one of Whall's immediate family members is a regular full-time employee of ADT in a managerial position, with an annual salary, bonus, and benefits of approximately $169,000.

164.     Defendant Whall is additionally unable to evaluate a demand with independence as he may fear retaliation against himself or his family members should he grant a demand. Defendant Whall breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**III.     Demand is Futile as to Defendant Rayman**

165.     Rayman has served as a Company director since 2016,  and is a member of the Audit Committee.  Rayman is beholden to the Apollo Defendants by virtue of his position as a Principal at Apollo, where he has worked since 2010, and to ADT and the Apollo Defendants by virtue his position as a manager of Prime Borrower, which he has held since 2015.  He is thus

unable to fairly and independently assess any demand made upon the Board. He was also designated to his position on the Board by Apollo and, as the Company admits, is a non-independent director.

166.    As a trusted Company director and member of the Audit Committee, Rayman conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

167.    Moreover, Defendant Rayman is a defendant in both the Federal Securities Class Action and State Securities Class Action. Rayman made many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement. For these reasons, Rayman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**IV.     Demand is Futile as to Defendant Becker**

168.    Becker has served as a Company director since 2016 and serves as Chairman of the Board. He is beholden to the Apollo Defendants by virtue of his position as Senior Partner of Apollo where he has worked since 1996, and to ADT and the Apollo Defendants by virtue his position as a manager of Prime Borrower, which he has held since 2015. Becker is thus unable to fairly and independently assess any demand made upon the Board.

169.    Becker was designated to his position on the Board by Apollo and, as the Company admits, Becker is a non-independent director. As a director and as Chairman, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

170.    Moreover, Becker is a defendant in both the Federal Securities Class Action and State Securities Class Action.  Defendant Becker made many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement.  For these reasons, Director-Defendant Becker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

## V.    Demand is Futile as to Defendant Press

171.    Press has served as a Company director since 2016.  He is beholden to the Apollo Defendants by virtue of his position as Senior Partner of Apollo where he has worked since 1998, and to ADT and the Apollo Defendants by virtue his position as a manager of Prime Borrower, which he has held since 2016.  Press is thus unable to fairly and independently assess any demand made upon the Board.

172.    Press was designated to his position on the Board by Apollo and, as the Company admits, Defendant Press is a non-independent director.  As a director, Press conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

173.    Moreover, Director-Defendant Press is a defendant in both the Federal Securities Class Action and State Securities Class Action.  Defendant Press also made many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement.  For these reasons, Defendant Press breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

## VI.     Demand is Futile as to Defendant Nord

174.     Nord has served as a Company director since 2016.  He is beholden to the Apollo Defendants by virtue of his position as Senior Partner of Apollo where he has worked since 2003, and to ADT and the Apollo Defendants by virtue his position as a manager of Prime Borrower, which he has held since 2015.  Nord is thus unable to fairly and independently assess any demand made upon the Board.

175.     Nord was also designated to his position on the Board by Apollo, and, as the Company admits, Defendant Nord is a non-independent director. As a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

176.     Moreover, Defendant Nord is a defendant in both the Federal Securities Class Action and State Securities Class Action.  Director-Defendant Nord made many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement.  For these reasons, Defendant Nord breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

## VII.    Demand is Futile as to Defendant Drescher

177.     Drescher has served as a Company director since 2017.  She is beholden to the Apollo Defendants by virtue of her position as Senior Partner of Apollo where she has worked since 2004, and to ADT and the Apollo Defendants by virtue her position as a manager of Prime Borrower, which she has held since 2017.  Drescher is thus unable to fairly and independently assess any demand made upon the Board.

178.     Drescher was also designated to her position on the Board by Apollo and, as the Company admits, Defendant Drescher is a non-independent director.  As a director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, she consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

179.     Moreover, Defendant Drescher is a defendant in both the Federal Securities Class Action and State Securities Class Action.  Defendant Drescher also made many of the false statements and omissions of material fact that are alleged herein, as she signed the Registration Statement.  For these reasons, Director-Defendant Drescher breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**VIII.   Demand is Futile as to Defendant Solomon**

180.     Solomon has served as a Company director since 2016.  He is beholden to the Apollo Defendants by virtue of his position as Senior Partner of Apollo Private Equity where he has worked since 2009, and to ADT and the Apollo Defendants by virtue his position as a manager of Prime Borrower, which he has held since 2016.  Solomon is thus unable to fairly and independently assess any demand made upon the Board.

181.     Solomon was also designated to his position on the Board by Apollo and, as the Company admits, Defendant Drescher is a non-independent director.  As a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, he consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

182.     Moreover, Defendant Solomon is a defendant in both the Federal Securities Class Action and State Securities Class Action.  Defendant Solomon also made many of the false

statements and omissions of material fact that are alleged herein, as he signed the Registration Statement.  For these reasons, Defendant Solomon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

## IX.    Demand is Futile as to Defendant Ryan

183.    Ryan has served as a Company director since 2016. He has further served as a manager of Prime Borrower since 2016, and is thus beholden to ADT and the Apollo Defendants. He was also designated to his position on the Board by "certain investors in [ADT's] indirect parent entities other than Apollo."  Thus, as the Company admits, Director-Defendant Ryan is a non-independent director.

184.    As a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, he consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

185.    Moreover, Defendant Ryan is a defendant in both the Federal Securities Class Action and State Securities Class Action.  Defendant Ryan also made many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement.  For these reasons, Defendant Ryan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

## X.    Demand is Futile as to Defendant Africk

186.    Defendant Africk has served as a Company director since 2016 and is a member of the Audit Committee.  Defendant Africk receives substantial compensation from ADT, including $100,000 in fiscal year 2017, and stands to earn twice that amount in fiscal year 2018.  He has

served as a manager of Prime Borrower since 2015, and is thus beholden to ADT and the Apollo Defendants.  He is further beholden to the Apollo Defendants by virtue of his history with Apollo, where he worked for twenty-one years prior to starting his own private investment company in 2013, and thus is unable to fairly and independently assess any demand made upon the Board.

187.    As a director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, he consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

188.    Moreover, Defendant Africk is a defendant in both the Federal Securities Class Action and State Securities Class Action.  Defendant Africk also made many of the false statements and omissions of material fact that are alleged herein, as he signed the Registration Statement.  For these reasons, Defendant Africk breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

### COUNT ONE

**Against Whall, Likosar, Becker, Rayman, Nord,<br>Africk, Press, Solomon, Drescher, Watson, Ryan, and Finney<br>For Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

189.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

190.    Defendants Whall, Likosar, Becker, Rayman, Nord, Africk, Press, Solomon, Drescher, Watson, Ryan, and Finney ("Section 10(b) Defendants") participated in a scheme to defraud with the purpose and effect of defrauding ADT.  Not only is the Company forced to defend claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, ADT is itself one of the largest victims of the unlawful scheme perpetrated by the Section 10(b)

Defendants.  While the price of its common stock was trading at artificially-inflated prices as a result of the Section 10(b) Defendants' misconduct, the Section 10(b) Defendants caused the Company to repurchase approximately $58,842 of its own equity securities at artificially-inflated prices, damaging ADT.

191.    The Section 10(b) Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements.

192.    The Section 10(b) Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ADT not misleading.

193.    The Section 10(b) Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, the Section 10(b) Defendants controlled the conduct complained of herein and the content of the public statements disseminated by ADT.

194.    The Section 10(b) Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, although such facts were available to them.  The Section 10(b) Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and

misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

195.    By virtue of the foregoing, the Section 10(b) Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## **COUNT TWO**
**Against All Defendants**
**for Violations of Section 20(a) of the Exchange Act**

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    The Individual Defendants and Apollo Defendants, by virtue of their positions with ADT and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of ADT within the meaning of § 20(a) of the Exchange Act.  The Individual Defendants and Apollo Defendants had the power and influence and exercised the same to cause ADT to engage in the illegal conduct and practices complained of herein.

## **COUNT THREE**
**Against All Defendants**
**for Breach of Fiduciary Duties**

1.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

1.    Defendants each owed ADT and its shareholders the fiduciary duties of loyalty, good faith, candor, and due care in managing and administering the Company's affairs.

2.    Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial affairs of ADT.

3.    Defendants breached their fiduciary duties owed to ADT and its shareholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties.  They caused the

Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee ADT's business, and caused the Company to fail to maintain internal controls, rendering them personally liable to the Company.

4.    Defendants also breached their fiduciary duties by knowingly causing and/or recklessly allowing the Company to make false and misleading statements and omissions of material fact.  Specifically, Defendants failed to disclose the true nature of ADT's relationship with Zonoff and the Z1 Platform, including the known uncertainty associated with the Zonoff Action and that ADT's proprietary information and code were disclosed to Ring, thereby allowing Ring to compete directly with ADT.

5.    Defendants also failed to disclose material information about ADT's business prospects and competitive challenges, including:  (1) ADT's lack of a material foothold in the DIY home security market; (2) that Ring was soliciting ADT's customers by marketing its alarm product as a replacement for ADT Pulse; (3) Ring's market share grab was not speculative; (4) that competition had shifted from cable and telecommunication companies to technology companies like Google, Amazon, and Apple; (5) ADT was not a "partner of choice for leading technology companies," as evidenced by Amazon's acquisition of Ring shortly after the IPO; and (6) attractive growth opportunities for complementary products and services through partnerships with leading technology firms did not exist, nor would any then current partnership expand ADT's presence into new channels.

6.    Additionally, Defendants made false and/or misleading statements and or failed to disclose material information relating to the Company's IPO, including:  (1) certain factors made the IPO more speculative and risky than the Registration Statement disclosed; (2) the Registration Statement referred to a number of material trends and results that had already manifested, as

potential risks; and (3) the estimated ranges for the then-complete 2017 fiscal results in the Registration Statement were unrealistic based on the financial results from the 2017 fiscal year.

7.      As a direct and proximate result of the Defendants' breaches of their fiduciary duties of loyalty, good faith, candor and due care, as alleged herein, ADT has sustained, and continues to sustain, significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT FOUR**

**Against All Defendants**
**for Unjust Enrichment**

8.      Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

9.      By their wrongful acts and false and misleading statements and omissions of material fact, the Individual Defendants and Apollo Defendants were unjustly enriched at the expense and to the detriment of ADT.

10.     The Individual Defendants and Apollo Defendants either benefitted financially from the improper conduct by, (1) receiving unjustly lucrative bonuses tied to the false and misleading statements, (2) receiving bonuses, stock options, or similar compensation from ADT that was tied to the performance or artificially inflated valuation of ADT, or (3) receiving compensation that was unjust in light of the Individual Defendants and Apollo Defendants' bad faith conduct.

11.     Plaintiff, as a shareholder and a representative of ADT, seeks restitution from Defendants and seeks an order from this Court disgorging all profits obtained by the Individual and Apollo Defendants resulting from their wrongful conduct and breach of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of ADT and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  October 11, 2018                    Respectfully Submitted,

**KOMLOSSY LAW, P.A.**
By:   */s/ Emily Komlossy*
Emily Komlossy (FBN 7714)
4700 Sheridan Street, Suite J
Hollywood, FL 33021
Telephone: (954) 842-2021
Facsimile: (954) 416-6223
eck@komlossylaw.com

*Liaison Counsel for Plaintiff*

**BRAGAR EAGEL & SQUIRE P.C.**
Lawrence P. Eagel
Melissa A. Fortunato
Marion Passmore
Shaelyn Gambino-Morrison
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone: (212) 308-5858
Facsimile: (212) 214-0506
eagel@bespc.com
fortunato@bespc.com
passmore@bespc.com
gambino-morrison@bespc.com

*Counsel for Brian Bradel*

**VERIFICATION**

I, Brian Bradel, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint; that I have reviewed the Verified Stockholder Derivative Complaint; and that the facts therein are true and correct to the best of my knowledge, information, and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATED: October ____, 2018

*Brian Bradel*
Brian Bradel (Oct. 11, 2018)
_____
Brian Bradel